## MATTER OF IBERIA AIRLINES FLIGHT #IB 951

### In Fine Proceedings

### NYC 10/52.7993

### *Decided by Board October 25, 1988*

(1) Carriers subject to the requirements of section 271(a) of the Immigration and Nationality Act, 8 U.S.C. § 1321(a) (1982), fulfill their responsibilities under that section when they present their alien passengers for inspection at the place of arrival.

(2) The custody requirements of 8 C.F.R. § 235.3(d) only apply to carriers who have entered into a contract with the Attorney General under section 238 of the Act, 8 U.S.C. § 1228 (1982).

BASIS FOR FINE: Act of 1952—Sec. 271(a) [8 U.S.C. § 1321(a)]—Failed to prevent unauthorized landing of aliens

ON BEHALF OF CARRIER: Celestino Pena, Esquire
U.S. General Counsel
Iberia Air Lines of Spain
97–77 Queens Boulevard
Rego Park, New York 11374

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated January 23, 1986, the district director found Iberia Air Lines, hereafter referred to as the "carrier," liable for administrative fines totalling $17,000 for 17 violations of section 271(a) of the Immigration and Nationality Act, 8 U.S.C. § 1321(a) (1982). The district director, however, granted mitigation in the amount of $4,200 for the first 13 violations. He then subtracted that amount and imposed fines totalling $13,800 on the carrier.[1] The carrier has appealed. The appeal may be untimely. We will review the appeal by certification pursuant to our discretionary au-

---

[1] The $4,200 figure may be the result of a mathematical error. The district director indicates in the body of the decision that the mitigation will be $300 for each of the first 13 violations, which would result in a total of $3,900. We note further that the total of $13,800 would be incorrect in any event. Subtracting $4,200 from $17,000 leaves a total of $12,800, not $13,800.

thority under 8 C.F.R. § 3.1(c) (1988). A request the carrier has made for oral argument before this Board is denied as a matter of discretion. 8 C.F.R. § 3.1(e) (1988). The appeal will be sustained.

On December 21, 1984, the carrier brought 77 Cuban nationals to the United States from Madrid, Spain, and presented them for inspection as returning refugees who previously had been admitted to the United States for political asylum. All of the aliens presented the same refugee travel documents. The immigration officer who inspected them concluded that their travel documents were fraudulent. Consequently, they were detained for exclusion hearings before an immigration judge pursuant to section 235(b) of the Act, 8 U.S.C. § 1225(b) (1982).

Apparently, the Immigration and Naturalization Service was willing to detain only 26 of these aliens. In any event, the Service issued a Notice to Detain, Deport, Remove or Present Aliens (Form I-259), served it on the carrier, and returned the other 51 aliens to the custody of the carrier. The Form I-259 directed the carrier to present the 51 aliens at the Service office on December 26, 1984, for hearings before an immigration judge. Thirteen of the aliens absconded before they could be presented for exclusion hearings, and four more subsequently absconded on January 10, 1985.

On March 1, 1985, the district director issued a Notice of Intention to Fine under Immigration and Nationality Act (Form I-79) in which it was alleged that the carrier is liable for $17,000 in administrative fines under section 271(a) of the Act for failing to prevent 17 of the aliens from making unauthorized landings.

The carrier responded in a letter dated May 17, 1985. According to the carrier, it could not have ascertained through the exercise of reasonable diligence that the documents presented by the alien passengers were forgeries.[2] The carrier offered to return the aliens to Spain immediately despite pressing burdens caused by the demands of the holiday travel season, but the Service rejected the offer on the ground that political considerations precluded such removal to Spain. No indication was given by the Service with regard to a place at which the carrier could maintain custody over 51 aliens. The carrier accepted custody over the aliens, arranged for hotel accommodations, advised the hotel manager of the situation, and retained a professional security service to guard the group. The high holiday occupancy of hotels and the size of the group resulted in having to lodge the aliens on five different floors. Finally,

---

[2] This is the standard for remission of fines imposed under section 273 of the Act, 8 U.S.C. § 1323 (1982). Apparently, however, fines were not imposed under that section of the Act.

the wide media coverage of the arrival of these aliens resulted in an extraordinary number of people and reporters, in addition to friends and relatives of the aliens, congregating at their hotel. In view of these circumstances, the carrier contends that no fine should be imposed.

The record also contains an affidavit from one of the security guards, which was taken on December 26, 1984. He explains that there were only four guards to cover the five floors on which the aliens were located.

The district director found liability for 17 violations of section 271(a) of the Act. With regard to the 13 escapes that occurred sometime between December 22 and 26, he found that the unusual circumstances warranted mitigation in the amount of $300 for each of these violations. With regard to the four escapes that occurred on January 10, 1985, however, he found that mitigation was not warranted. According to the district director, the carrier should have tightened security by that time in view of the previous escapes. He concluded that the carrier had committed 17 violations of section 271(a) of the Act and imposed administrative fines totalling $13,800.

On appeal, the carrier contends, inter alia, that the Service should have provided detention facilities and security for the alien passengers involved in this case.

The pertinent part of section 271(a) of the Act reads as follows:

> It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines . . . *other than transportation lines which may enter into a contract as provided in section 238,* bringing an alien to, or providing a means for an alien to come to, the United States . . . to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers. Any such person . . . who fails to comply with the foregoing requirements shall be liable to a penalty . . . of $1,000 for each such violation, which may, in the discretion of the Attorney General, be remitted or mitigated by him . . . . (Emphasis added.)

Section 238 of the Act, 8 U.S.C. § 1228 (1982), authorizes the Attorney General to enter into special contracts with transportation lines. Transportation lines that have executed such contracts are known as "signatory lines." The carrier in this case was a signatory line when the violation of section 271(a) of the Act allegedly occurred. 8 C.F.R. § 238.3(b) (1984).[3] The subject of the carrier's contract was the transportation of aliens through the United States in immediate and continuous transit. 8 C.F.R. § 238.3(a) (1984). The contract enabled the carrier to facilitate the transit of such passen-

---

[3] The carrier still is a signatory line. 8 C.F.R. § 238.3(b) (1988).

gers through the United States, principally by relieving them of documentary requirements that otherwise would have applied to them. Passengers covered by such agreements are known as "TRWOV" (transit without visa) aliens. In return for this benefit, the carrier agreed, inter alia, that it would not accept for passage any alien without a valid passport, a travel document authorizing his admission to the country of destination, and confirmed reservations through and beyond the United States. Moreover, the carrier agreed to hold the alien under guard while he is not aboard an aircraft in flight through the United States. We note further that the carrier agreed to the payment of a specified penalty for every violation of the contract. *See generally* 2 C. Gordon & H. Rosenfield, *Immigration Law and Procedure*, § 9.20 (rev. ed. 1988).

It does not necessarily follow that the carrier's signatory line status exempted it from fine liability under section 271(a) of the Act. The Cuban national passengers involved in this case were not TRWOV aliens. They were brought to the United States and presented for admission as returning refugees. Consequently, it is not apparent that any purpose would be served by allowing the carrier's signatory line status to exempt it from fine liability under section 271(a) of the Act with regard to these aliens. On the other hand, the terms of that section appear to exempt categorically all transportation lines which may enter into a contract as provided in section 238 of the Act. It is not necessary, however, to resolve that issue in this case. The carrier cannot be found in violation of section 271(a) of the Act in any event.

Upon arrival at Jamaica, New York, the carrier presented the alien passengers for inspection. If the carrier was exempt from fine liability under section 271(a) of the Act on the basis of its signatory line status, any penalty for the subsequent failure to maintain custody over the alien passengers would have to derive from the contract under section 238 of the Act. If, on the other hand, the carrier's signatory line status did not apply to this situation, the Service did not have authority to require the carrier to maintain custody over the aliens after the initial presentation of them for inspection.

Prior to an amendment of 8 C.F.R. § 235.3 (1982) by an interim rule which went into effect on July 9, 1982, more than 2 years before the events in question occurred, the Service had authority to require nonsignatory lines to maintain custody of alien passengers pending exclusion hearings. At that time, 8 C.F.R. § 235.3 (1982) read as follows:

(a) *Prior to inspection.* All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival

by the master, commanding officer . . . or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service . . . .

(b) *Detention after inspection.* If in the opinion of examining immigration officer it is not practical to resolve a question of admissibility at the time of arrival of a passenger on a vessel or aircraft, the officer shall execute a Form I-259 to notify the agent for the vessel or aircraft . . . that the passenger is to be presented for further inspection.

The interim rule expanded these provisions to ensure that the detention practices of the Service would conform to statutory purposes and legislative intentions. *See* 47 Fed. Reg. 30,044, 30,046 (1982). It retained paragraph (a) of the former provisions and added the following new paragraphs:

(b) *Aliens with no documentation or false documentation.* Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents . . . or who arrives with documentation which appears to be false, altered, or otherwise invalid, . . . shall be detained in accordance with section 235(b) of the Act . . . .

(c) *Aliens with documents.* Any alien who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b), may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not a parole or a parole for deferred inspection is warranted the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

The interim rule also revised the paragraph that authorizes the practice in question to make it read as follows:

(d) *Carrier custody.* Any alien subject to detention under paragraph (b) or (c) of this section may be placed in the custody of the carrier *if the carrier has entered into a contract with the Attorney General under section 238 of the Act.* If in the opinion of the examining immigration officer it is not practical to resolve a question of admissibility at the time of arrival of a passenger on a vessel or aircraft, the officer shall execute Form I-259 to notify the agent for the vessel or aircraft . . . that the passenger is to be presented for further inspection. (Emphasis added.)

We construe these changes as a limitation on the employment of the practice in question to cases in which a carrier has entered into a contract under section 238 of the Act.[4] Consequently, if the carrier's status as a signatory line did not apply to the bringing of the aliens involved in this case, the Service did not have authority to require the carrier to maintain custody over them pending their exclusion hearings. It follows, therefore, that if the carrier was subject to section 271(a) of the Act, the carrier fulfilled its responsibilities under that section when it presented the aliens for inspection at the place of arrival.

---

[4] The final version revised paragraphs (b) and (c) of the interim rule in ways that have no bearing on the issue in this case. It became effective on November 18, 1982, and it remains in effect.

We conclude, therefore, that the Service has failed to establish that the carrier is liable for fines under section 271(a) of the Act.

Accordingly, the following orders will be entered.

**ORDER:** The appeal is sustained.

**FURTHER ORDER:** The fines imposed upon the carrier by the district director are cancelled, and these proceedings are terminated.